Hillsborough County Probate Court
No. 2003-829

IN RE ESTATE OF J. DOUGLAS KING

Argued: July 14, 2004
Opinion Issued: September 9, 2004

*Robert A. Stein & Associates, PLLC,* of Concord (*George T. Campbell, III* on the brief and orally), for the petitioner.

*Rath, Young and Pignatelli, P.A.,* of Concord (*Andrew W. Serell* on the brief and orally), for the respondents.

DUGGAN, J. The petitioner, Laurel King, the executrix of the Estate of J. Douglas King, appeals an order of the Hillsborough County Probate Court (*Cassavechia,* J.) declaring the decedent to be intestate because the petitioner failed to prove by a preponderance of the evidence that the decedent's will was more likely lost than destroyed. The petitioner also appeals the award of attorney's fees. We affirm in part and reverse in part.

This case is before us again after remand. *See In re Estate of King,* 149 N.H. 226 (2003) (*King I*). We recite only a brief history of facts necessary to decide this appeal.

In 1994, the decedent, J. Douglas King (hereafter, Douglas), executed a will that left his estate to the petitioner, his second wife of fifteen years, with whom he had two minor children. In 1997, Douglas executed a codicil to the will. The codicil made no substantive changes to the will, but merely altered provisions for appointing the executor and trustees, and otherwise reconfirmed the 1994 will.

Douglas died suddenly and unexpectedly in a motorcycle accident on September 10, 2000. *Id.* at 228. The original 1994 will, last known to be in Douglas' possession, was never found. *Id.* Instead, the petitioner obtained the 1997 original codicil and a copy of the 1994 will and filed them with the probate court. *Id.*

The respondents, Rebecca King Felmet, Rachel King and Jason King, are Douglas' three adult children from a previous marriage. *Id.* They contested the documents filed by the petitioner, arguing that the 1994 will had been revoked. *Id.* The probate court applied a presumption of revocation, conducted an evidentiary hearing to determine the likely fate of the will and ruled that the petitioner failed to rebut the presumption of revocation. *Id.* at 228-30.

In *King I*, the petitioner challenged, among other things, the probate court's application of the presumption of revocation. *Id.* at 230. We reversed and remanded because the probate court used an incorrect legal standard for the presumption, admitted improper hearsay evidence and did not consider certain testimony. *Id.* at 232. On remand, we instructed the probate court to: (1) not apply the presumption of revocation because it had vanished; (2) re-evaluate and make specific findings on the credibility of certain testimony; (3) exclude specific hearsay evidence; and (4) determine whether the petitioner established by a preponderance of the evidence that the will was more likely lost than destroyed. *Id.* at 233-35.

In accordance with our instructions, the probate court did not apply the presumption of revocation, reconsidered the evidence and made the following relevant factual findings. Douglas and the petitioner had a "stormy" marriage. Their relationship, although generally loving, was oftentimes "rocky and troubled." On two occasions, divorce was contemplated and legal counsel secured. The relationship between Douglas and the petitioner became so estranged in the last year of his life that, in contemplation of divorce, they began to divide their assets. About two months before Douglas' death, they reconciled for a brief period. On September 2, 2000, one week before Douglas' death, they had another "blowout." After this fight, Douglas wrote a missive to himself lamenting that his "life ha[d] come to an end."

The court then re-evaluated the testimony and made specific findings on the credibility of the testimony of two witnesses, John Zelonis and Donna Stafford, both of whom supported the petitioner's position that the will was lost and not revoked. With regard to Zelonis' testimony, the court found that it "carrie[d] little weight given its internal inconsistencies." As for Stafford's testimony, the court found that it was "strained."

In summary, the court stated:

> [T]he evidence suggests that the decedent had become dissatisfied with his 1994 estate plan during the last year of his life. The evidence also shows that the relationship between the decedent and his family changed to such an extent during his last year that it is more likely that he revoked the 1994 will. He was clearly engaging people in conversations about how to include his adult children in his estate plan .... His relationship with his wife was also clearly in trouble, if not nearing an end. He had even begun to divide their mutual property. He felt that [the petitioner] was unkind and disrespectful to him. He also felt that his younger children were disrespectful towards him. He

expressed sentiments such as feeling belittled by [the petitioner] and his younger children. Finally, [the petitioner] remembered moving the couple's important papers . . . . She also recalled that their wills were contained in blue envelopes and had been filed together. However, when she looked for the decedent's will, she could only find the empty envelope.

Based upon these findings, the probate court ruled that the petitioner failed to establish by a preponderance of the evidence that the will was more likely lost than destroyed. Accordingly, the probate court did not admit the copy of the will to probate and ordered distribution of the estate in accordance with the laws of intestacy. *See* RSA 561:1 (Supp. 2003). This appeal followed.

## I. Presumption of revocation

First, the petitioner argues that the probate court erred because it applied the presumption of revocation which was contrary to our instruction in *King I.* We disagree.

■ The petitioner's argument hinges on the probate court's statement that the petitioner "has failed to rebut the presumption of revocation." Although this statement read in isolation appears to be contrary to our instruction in *King I,* a review of the whole order makes it clear that the probate court did not apply the presumption of revocation. The probate court's order subsequently acknowledged that "the presumption of revocation 'vanished'" and that it was "to determine whether [the petitioner] has proven by a preponderance of the whole of the evidence that the will was more likely lost rather than destroyed." After reviewing the evidence, the probate court concluded: "It is simply not likely that the will was lost in light of all of this evidence. It is more likely than not that the decedent destroyed the will . . . ." Based upon a review of the order in its entirety, we conclude that the probate court applied the correct standard on remand.

## II. Sufficiency of evidence

Next, the petitioner argues that the probate court erred in finding that she failed to establish by a preponderance of the evidence that the will was more likely lost than destroyed. We disagree.

We will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law. RSA 567-A:4 (1997); *In re Estate of Locke,* 148 N.H. 754, 755 (2002). We review the record of the proceedings before the probate court to determine if the

findings, as made by the probate judge, could be reasonably made, given the testimony presented. *In re Buttrick*, 134 N.H. 675, 676 (1991). In reviewing this record, we are guided by the rule that "the trier of fact is in the best position to measure the persuasiveness and credibility of evidence and is not compelled to believe even uncontroverted evidence." *Id.* (quotation and brackets omitted). Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence. *Cook v. Sullivan*, 149 N.H. 774, 780 (2003).

A review of the record reveals the following evidence, which is sufficient to sustain the probate court's ruling that it was "simply not likely that the will was lost" and "more likely than not that the decedent destroyed the will in an effort to promote equality between [*sic*] his children."

### A. Evidence will was lost

The evidence adduced at trial that the will was lost, and not revoked, is found in the testimony of Zelonis and Stafford. The probate court, after assessing the credibility of these witnesses, gave their testimony little weight. Witness credibility is a finding of fact and will not be overturned unless clearly erroneous or unsupported by the evidence. *Red Hill Outing Club v. Hammond*, 143 N.H. 284, 290 (1998).

In evaluating the credibility of Zelonis, the probate court found that his testimony was not "particularly helpful" because the only comment Douglas made to Zelonis regarding his estate was "an off-handed 'joking' comment." Zelonis testified that, on August 31, 2000, when he was going to have a shoulder operation, Douglas was being "a prankster" and asked "if I had my will put together and if I was leaving him everything." Zelonis testified that he responded by saying, "What difference does that make, I'm not worth anything . . . . But seriously, what about you Doug? What would happen if you died tomorrow." Zelonis then testified that Douglas said his affairs had been in order for years.

The probate court also gave Zelonis' testimony "little weight given its internal inconsistencies." One such inconsistency involved Zelonis' testimony about the relationship between Douglas and the petitioner. First, Zelonis testified that Douglas was planning a second honeymoon with the petitioner. At another point, Zelonis testified to another conversation in which Douglas asked Zelonis to locate a property appraiser to appraise all the properties because he wanted "to make a financial division between [the petitioner] and [himself]." Based upon a review of the record, we hold that the findings of the probate court as to

the credibility and weight of Zelonis' testimony are not clearly erroneous or unsupported by the evidence. *Id.*

In evaluating the credibility of Stafford, the probate court found that her testimony was "strained." First, her testimony regarding Douglas' relationship with his adult children "contradicted all of the other evidence." Stafford testified that Douglas referred to his adult children as "dark shadows" and "dark forces" in his life and that he did not have a close relationship with them.

In contrast, the petitioner testified that Douglas always had a close relationship with his adult daughters. Douglas' close friend and Donna Stafford's husband, Robert Stafford, testified that Douglas was proud of his adult children and that Douglas' recent bonding with Jason was a "happy experience." Another close family friend testified that Douglas had a good relationship with his adult children and always spoke positively of them. Finally, all three adult children testified that they had a close, loving relationship with their father.

Second, Stafford testified that Douglas told her "that he had prepared his will, that he had left everything to [the petitioner] . . . and he knew that she would take care of all of his children." The petitioner, on the other hand, testified that Douglas had never discussed providing for his three adult children after his death.

Third, Stafford testified that Douglas called her and was joking and laughing about the fight he had with the petitioner on September 2, 2000, the week before his death. Stafford described the conversation as follows: "[The petitioner] had refused to go out to breakfast because he had invited Jason, his son, and that she had thrown the diamond that he had bought her, and he laughed." In contrast, Douglas' diary entries following the fight lamented:

> [E]motionally and psychologically, I feel at this moment . . . heaviness and sadness. In the last [twelve] months I have felt like a dog penned up in a narrow crate, opposed by the vague sense of impending calamity, surrounded by throngs of heartless people, jeering and poking psychological sticks of fear and torment through the slats.
>
> Emotionally and psychologically speaking, I've been repeatedly thrown down, choked, laughed at, clubbed, whipped, slapped at, and scorned. Any achievement or conduct deserving of merit has been rewarded not with kindness but merely the withholding of another blow.

> Earlier this morning, my wife and children walked out again. Why? Because I invited my son from [a] previous marriage to have breakfast with us. She returned, once again, her wedding band and diamonds, and once again the children sided with her.
>
> I feel as though I am unable to write another word, walk another step, or breathe another breath. I feel as though finally my life has come to an end. However, I must be strong for myself, my children, and for those I may be able to assist in the future who have fallen upon the same hopeless times as I.

The diary entry concluded with: "Priorities: Mental, physical and spiritual well-being for: Myself . . . Children . . . Laurel."

Finally, the probate court also stated that "Stafford's memory may have . . . been jaded by her new close relationship with [the petitioner]." Stafford testified that she was "a good friend" of the petitioner. Stafford also acknowledged that she had hugged the petitioner when she arrived at the probate court to testify. Based upon a review of the record, we hold that the findings of the probate court as to the credibility and weight of Stafford's testimony are not clearly erroneous or unsupported by the evidence. *Id.*

### B. Evidence will was revoked

The evidence adduced at trial that the will was revoked included: (1) testimony that the relationship between Douglas and his family changed during the last year of his life; (2) testimony that Douglas became dissatisfied with his 1994 estate plan during the last year of his life because it did not benefit all of his children; and (3) the original will was last in Douglas' possession and has not been located.

First, the probate court found that "the relationship between the decedent and his family changed to such an extent during his last year that it is more likely that he revoked the 1994 will." The petitioner testified that, during the last year of his life, Douglas thought his younger children were disrespectful of him and, in a letter dated June 12, 2000, he stated that the younger children had "subjected [him] to a humiliating and disdainful disrespect over the last several months." The petitioner also testified that, during that same time, Douglas thought he was disrespected by the petitioner and in a letter to her dated June 15, 2000, stated that he would "not allow [himself] to be lowered or berated any more." Finally, the petitioner testified that, during the last year of Douglas' life, they had several "blowout[s]," were physically separated on several occasions, were considering a separation as late as the summer of 2000, and undertook to

divide their assets, live at separate residences and auction off their other property.

While Douglas' relationship with the petitioner and their children was deteriorating, his relationship with his adult daughters remained strong. In addition, during the last year of his life, Douglas' relationship with his son, Jason, was improving and growing closer.

Second, the probate court found that "the evidence suggests that the decedent had become dissatisfied with his 1994 estate plan during the last year of his life." Submitted into evidence was a 1997 letter from Attorney Ellen Peterson, the scrivener of the 1997 codicil, to Douglas and the petitioner, outlining various estate planning options that were available. The letter stated that Douglas and the petitioner had expressed their estate planning objectives to include "provid[ing] for the comfort and well-being of the survivor of [them], while protecting [their] assets with the ultimate goal of benefiting [their] children." In 1999, the objective of providing for the children was again discussed with Attorney Douglas Hatfield. In a letter to Douglas detailing their discussions, Hatfield stated that one of the potential goals of the estate planning was to "provide separate trusts for Doug's family and grandchildren." According to Hatfield, Douglas considered the 1994 will to be "temporary" and "a 'band-aid' until he could do something else."

Third, the probate court found that Douglas retained the original 1994 will, which the petitioner has been unable to locate. The petitioner testified that she and Douglas kept their original 1994 wills. The wills were kept in Douglas' office in their home in Charlotte, North Carolina. When they moved to Marblehead, Massachusetts, the original wills were placed in Douglas' home office because it was a "safe place" where they "would not be lost or misplaced." The petitioner testified that, in the course of many moves, she had moved files of important documents, which included two blue envelopes that she believed contained their original wills. Since Douglas' death, however, the petitioner has been unable to locate Douglas' original 1994 will.

 We acknowledge that the facts of this case do not overwhelmingly dictate a particular result. Nevertheless, because a reasonable person could decide as did the probate court based upon the evidence, we defer to the probate court's findings. *Cook*, 149 N.H. at 780. Accordingly, based upon a review of the record, we hold that the probate court's finding that the petitioner failed to establish by a preponderance of the evidence that the will was more likely lost than destroyed is not plainly erroneous and could be reasonably made. *See* RSA 567-A:4.

*III. Attorney's fees*

Finally, the petitioner argues that the probate court erred in finding that the estate is responsible for the respondents' attorney's fees. We agree.

On January 17, 2002, the respondents filed a motion requesting an award of attorney's fees. The petitioner objected, but later withdrew her objection. On June 6, 2002, the probate court granted the motion for attorney's fees without objection. The petitioner reimbursed the respondents' attorney's fees until March 6, 2003, the date we issued our decision in *King I.* After that date, the petitioner stopped paying the respondents' attorney's fees. On October 1, 2003, the respondents filed a motion to enforce the June 6, 2002 order awarding attorney's fees. On December 19, 2003, over the petitioner's objection, the probate court granted the respondents' motion and conditioned future reimbursement of attorney's fees on the permission of the court.

We must first address the timeliness issue raised by the respondents. The respondents argue that the petitioner failed to file a timely notice of appeal for the award of attorney's fees. We disagree.

On December 24, 2003, the petitioner appealed the probate court's November 24, 2003 order and raised the sufficiency of the evidence issue. This notice of appeal was timely filed within the thirty days allowed by Supreme Court Rule 7. On January 29, 2004, the petitioner filed a motion to add a question to her notice of appeal. The petitioner sought to raise the issue of the award of attorney's fees, which was the subject of the probate court's December 19, 2003 order. The motion was timely filed within twenty days prior to the due date of the petitioner's brief. *See* SUP. CT. R. 16(3)(b). Accordingly, we reject the respondents' argument that the attorney's fees issue was not timely appealed.

The respondents next argue that the issue is not preserved because the petitioner withdrew her initial objection to the motion for attorney's fees. We agree that the initial award of attorney's fees is not preserved for appellate review. *See Lamontagne Builders v. Bowman Brook Purchase Group*, 150 N.H. 270, 274 (2003). We conclude, however, that the December 19, 2003 award of attorney's fees is preserved because the petitioner objected to the respondent's motion to enforce the award of attorney's fees. Accordingly, the probate court's order awarding attorney's fees accrued since March 6, 2003 is preserved for appellate review.

Having found that the December 19, 2003 order for attorney's fees is preserved, we next consider whether the award was proper. "New

Hampshire has no statute which compels or governs the allowance of [attorney's] fees in will contests. Attorney's fees are not allowed as a matter of right, and the general common law rule operates to deny them in the usual circumstance." 10 C. DEGRANDPRE, NEW HAMPSHIRE PRACTICE: PROBATE LAW AND PROCEDURE § 44-7, at 511 (3d ed. 2001); *see Concord Nat. Bank v. Haverhill,* 101 N.H. 416, 417-19 (1958). Nevertheless, we have held that "[attorney's] fees should be allowed only in those cases where the litigation is conducted in good faith for the primary benefit of the trust as a whole in relation to substantial and material issues essential to the proper administration of the trust." *In re Dumaine,* 135 N.H. 103, 110 (1991) (quotation omitted). However, "[w]here the parties seeking fees take positions to defeat a trust (or will), they are not entitled to an allowance of fees out of the trust property." DEGRANDPRE, *supra* at 511-12. Thus, the inquiry is whether the respondents' primary motive was to benefit the estate as a whole or themselves. *See Dumaine,* 135 N.H. at 110.

█ Here, the respondents were seeking to defeat a will offered for probate that excluded them as beneficiaries. If the respondents defeated the will, they would benefit from the estate passing according to the intestacy statute. We thus conclude that the respondents challenged the will for their own benefit and not for that of either the estate or the court. *See Murray v. Peabody,* 106 N.H. 319, 329 (1965). Accordingly, the trial court erred in awarding attorney's fees.

*Affirmed in part; reversed in part.*

BRODERICK, C.J., and NADEAU, DALIANIS and GALWAY, JJ., concurred.