Merrimack County Probate Court
No. 2005-316

IN RE GUARDIANSHIP OF E.L.

Argued: May 10, 2006
Opinion Issued: November 1, 2006

*Michael J. Sheehan*, of Concord, by brief and orally, for the ward.

*Scott D. McGuffin*, of Laconia, for the guardian, Tri-County Community Action Program, Inc., filed no brief.

*Kelly A. Ayotte*, attorney general (*Michael K. Brown*, senior assistant attorney general, on the brief and orally), for the New Hampshire Department of Corrections.

BRODERICK, C.J. The ward, E.L., appeals an order of the Merrimack County Probate Court (*Hampe*, J.) denying his motion to terminate guardianship. E.L. argues that the probate court erred in finding that the guardian proved beyond a reasonable doubt that he remains incapacitated to make his own medical decisions and that no less restrictive alternative to guardianship exists. We affirm.

I

The following facts could be found from the record. In 1994, E.L. was convicted of sexually assaulting his wife. He was deemed incompetent to be sentenced and confined to the Secure Psychiatric Unit (SPU) at the New Hampshire State Prison. While at SPU, his behavior fluctuated. At times, he was transferred to the most restricted unit because he verbally abused the staff, failed to follow rules, displayed inappropriate behavior, lacked self control and refused medication. By November 1995, his behavior was reported to be increasingly aggressive. He was diagnosed with bipolar disorder, and a guardian was appointed to ensure that he took prescribed medication and followed medical advice. He cooperated in taking lithium carbonate (lithium), a mood-stabilizing medication, and his condition improved. By June 1996, E.L. was deemed competent and was sentenced to seven and one-half to fifteen years in prison. He was transferred to the prison's general population in August 1996. His guardianship continued, and he remained cooperative in taking lithium.

E.L.'s current treatment team consists of Catherine Fontaine, an advanced registered nurse practitioner who is primarily responsible for prescribing and monitoring E.L.'s medication, Laura Magzis, E.L.'s

therapist at the prison, and Bonnie Ham, E.L.'s designated staff guardian, who works for Tri-County Community Action Program, Inc. In 2003, E.L. exhibited psychotic behavior and made delusional statements. Specifically, he reportedly was unkempt and disheveled, would not bathe, spoke "legal mumbo jumbo" and during therapy sessions related provocative language he used with fellow inmates that in his therapist's view had the potential to incite arguments. According to his therapist, E.L. suspected she was reading his mail, recording therapy sessions and interfering with his transfer to a prison in Maine. E.L. also related memories of events in prison that could not have happened and displayed an inability to appreciate the possibility that his memory was imprecise. He was diagnosed as suffering from psychotic features of his bipolar disorder, and in July 2003, an anti-psychotic medication, Risperidone, was prescribed for him. While E.L. did not agree that he suffered any psychosis, he agreed to take the prescribed medication. His behavior reportedly improved, and he continued to be compliant with taking his prescribed medications.

At some point, E.L. complained that he was suffering side effects from Risperidone. He grew concerned that it could cause diabetes. According to E.L., his son suffers from diabetes, as did his late father. He expressed a desire to stop taking Risperidone, or at least reduce the dosage or switch to a substitute drug. His treatment team agreed to a dosage reduction and to explore other medications should the side effects continue.

In 2004, E.L. requested the probate court to terminate his nearly ten-year guardianship. His guardian opposed the motion. In February 2005, psychiatrist Gerald Lazar conducted an independent evaluation of E.L. and reported that in his judgment, the limited guardianship should continue. In April 2005, after an evidentiary hearing, the probate court denied E.L.'s motion, and this appeal followed.

## II

Any interested person may file a petition with the probate court seeking a finding of incapacity with respect to a proposed ward and the appointment of a guardian. RSA 464-A:4, I (2004). By statute, there is a legal presumption of capacity, and the party seeking guardianship bears the heavy burden of proving with "competent evidence [and] beyond reasonable doubt that the proposed ward is incapacitated and in need of a guardian." RSA 464-A:8, IV (2004). At a hearing convened on such a petition, the probate court must "(a) [i]nquire into the nature and extent of the functional limitations of the proposed ward; and (b) [a]scertain his or her capacity to care for himself or herself or his or her estate." RSA 464-A:9, I (2004). Guardianship may be imposed over a person only after finding in the record based upon evidence beyond a reasonable doubt that:

(a) The person for whom a guardian is to be appointed is incapacitated; and

(b) The guardianship is necessary as a means of providing continuing care, supervision, and rehabilitation of the individual, or the management of the property and financial affairs of the incapacitated person; and

(c) There are no available alternative resources which are suitable with respect to the incapacitated person's welfare, safety, and rehabilitation or the prudent management of his or her property and financial affairs; and

(d) The guardianship is appropriate as the least restrictive form of intervention consistent with the preservation of the civil rights and liberties of the proposed ward.

RSA 464-A:9, III (2004).

When a ward seeks to terminate guardianship, "[u]nless the motion [to terminate] is without merit, the court shall hold a hearing similar to that provided for in RSA 464-A:8 and RSA 464-A:9 at which the guardian shall be required to prove . . . the grounds for appointment of a guardian provided in RSA 464-A:9." RSA 464-A:40, II(c). Accordingly, the guardian must prove beyond a reasonable doubt the existence of each factor delineated by RSA 464-A:9, III; namely, that: (1) the ward remains incapacitated; (2) guardianship is necessary; (3) no suitable alternative resources exist; and (4) guardianship is the least restrictive form of intervention.

In this case, the probate court concluded that "the reasons that the guardianship was granted remain." The probate court's decision explained:

[E.L.] suffers a mental illness. His diagnosis is Antisocial Personality Disorder and either Bipolar Affective Disorder, Manic with Psychotic Features or Schizoaffective Disorder. His illness has been effectively treated with medications which [have] been administered because of the existence of the guardianship and the consent of his guardian.

[E.L.] would like to terminate his guardianship which is limited to medical issues. He thinks that he is capable of making his own medical decisions. However, he has repeatedly stated his desire to stop taking Risperidone because of its side effects. In the opinion of Gerald Lazar, M.D., an independent psychiatrist, this would not reflect an informed decision. [E.L.] has limited insight into his illness.

The court finds that the reasons that the guardianship was granted remain. [E.L.] remains incapacitated with respect to

> making medical decisions. The court further finds that the limited guardianship is the least restrictive alternative. A power of attorney would not be sufficient because [E.L.] could cancel it. A springing guardianship would not meet [E.L.'s] needs because it would require [E.L.] to decompensate before it could be implemented. This would make further treatment more difficult and could result in an injury to [E.L.] or some other person during the time he decompensated.
>
> The petition to terminate the guardianship is denied.

By statute, "[t]he findings of fact of the [probate court] are final unless they are so plainly erroneous that [they] could not be reasonably made." RSA 567-A:4 (1997); *see* RSA 464-A:47 (2004) (providing that appeals from probate court decisions are governed by RSA chapter 567-A). Thus, we do not reweigh the evidence to determine whether we would have ruled differently. Rather, we review the record of the probate proceedings to determine if the probate court's findings could be reasonably made given the testimony and the evidence before it. *In re Buttrick*, 134 N.H. 675, 676 (1991). We defer to the judgment of the probate court to resolve "conflicts in testimony, measur[e] the credibility of witnesses, and determin[e] the weight to be given to testimony," *In re Guardianship of Kapitula*, 153 N.H. 492, 497 (2006), recognizing that as the trier of fact, it is in the best position to "measure the persuasiveness and credibility of evidence," *In re Estate of King*, 151 N.H. 425, 429 (2004). It lies "within the province of the trial court to accept or reject, in whole or in part, whatever evidence was presented." *In re Guardianship of Kapitula*, 153 N.H. at 497-98 (quotation omitted).

On appeal, E.L. argues that the probate court erred in finding that the evidence demonstrates beyond a reasonable doubt that he remains incapacitated and that no less restrictive alternative to guardianship exists, both necessary statutory components for the continuation of guardianship, *see* RSA 464-A:9, III(a), (c), (d). Our task is to review the record to determine whether it supports the probate court's finding that the guardian proved these statutory components beyond a reasonable doubt. *See* RSA 464-A:8, IV. Because E.L. challenges the sufficiency of the evidence, we examine whether the probate court's actual or implicit factual findings on the statutory components required for guardianship are reasonably supported by competent evidence. *See id.*; *In the Matter of B.T.*, 153 N.H. 255, 259 (2006). "We will not disturb the probate court's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law." *In re William A.*, 142 N.H. 598, 600 (1998) (quotation omitted).

## III

We first turn to whether the evidence supports the probate court's finding beyond a reasonable doubt that E.L. remains incapacitated to make his own medical decisions. E.L. argues that no evidence of recent acts or occurrences demonstrates beyond a reasonable doubt that he is incapacitated. According to him, substantial evidence establishes his competency, including his ten-year history of full compliance with taking his prescribed medications, his consent to continued consultation with medical providers and the soundness of his reasons for wanting to stop or reduce his intake of Risperidone. The New Hampshire Department of Corrections (State) contends that while the symptoms of E.L.'s mental illness have abated due to the success of the guardianship, he has limited insight and judgment about his illness and the consequences of stopping his medications. According to the State, the evidence establishes that E.L.'s sole motivation for terminating guardianship is to discontinue the very medications which have dramatically helped him, thereby causing him to decompensate and pose a danger to himself and others.

■ Incapacity is "a legal, not a medical, disability." RSA 464-A:2, XI (2004). To be deemed incapacitated, a person must have "suffered, [be] suffering or [be] likely to suffer substantial harm due to an inability to provide for his personal needs for food, clothing, shelter, health care or safety or an inability to manage his or her property or financial affairs." *Id.* Further, incapacity is measured by a person's "functional limitations," *id.*; that is,

> behavior or conditions in an individual which impair his or her ability to participate in and perform minimal activities of daily living that secure and maintain proper food, clothing, shelter, health care or safety for himself or herself.

RSA 464-A:2, VII (2004). Therefore, to overturn the probate court's finding that he continues to have an incapacity for making sound medical decisions, E.L. must demonstrate that no reasonable fact finder could find beyond a reasonable doubt that: (1) he is unable to provide for his personal needs for health care or safety; and (2) this inability has caused him to have suffered, be currently suffering or be likely to suffer "substantial harm." *See* RSA 464-A:2, XI. We particularly examine the record for evidence of "behavior or conditions" that impair E.L.'s "ability to participate in and perform minimal activities of daily living that secure and maintain proper ... health care or safety ... for himself." *See* RSA 464-A:2, VII.

The record contains competent evidence to support the conclusion that E.L. has limited insight into his mental illness, intends to stop taking his prescribed medications, is unable to exercise sound judgment about the potential consequences of ceasing or modifying his current medication regime and is likely to decompensate without medication, thus posing a danger to himself and others. Considered as a whole, this evidence supports a finding beyond a reasonable doubt that E.L. is unable to participate in and perform the minimal activities necessary for his health care such that substantial harm will likely occur without the medical guardianship.

With respect to E.L.'s understanding of his mental illness, both Lazar and Fontaine testified that he does not believe that he suffers psychotic features from his bipolar condition. While E.L. may acknowledge that he suffers from bipolar disorder, there is evidence that he does not appreciate the gravity of the symptoms he displays when not taking proper medication. Lazar testified that E.L.'s sexual assault of his wife, the crime for which he is incarcerated, is likely connected to his mental illness. Yet, E.L. denied to Lazar that he committed the assault, stating that his wife fabricated the charge. Further, E.L. told Lazar that he believes that he is "not mentally ill to the degree people say." Indeed, in his motion to terminate guardianship he stated: "My illness is not severe and I do as well off meds as on them."

In addition, evidence in the record permits a reasonable person to conclude that upon termination of the guardianship, E.L. intends to stop taking his prescribed medications either because he does not believe they are necessary or because he is concerned about their side effects. E.L. informed his guardian that he wanted a "medication holiday" to see how he feels. Again, in his motion to terminate guardianship, E.L. asserted: "I do as well off meds as on them." While portions of the record suggest that E.L. may be amenable to continuing lithium and maintaining a reduced dosage of Risperidone or another anti-psychotic medication, it was within the probate court's discretion, having assessed witness credibility, to conclude that E.L. was intent upon ceasing his medications. *See In re Estate of King*, 151 N.H. at 429.

No one disputes that E.L. has been compliant with his prescribed medications since his guardianship was imposed in 1995. Evidence supports the conclusion, however, that his compliance has been the direct result of the guardianship. Although requested to do so, E.L. refused to take any medications before the guardianship was ordered. Further, Fontaine testified that "[p]art of why he [maintains consistency with his medication] is the fact that he knows that he has someone else who has control over his need to stay on medication." Lazar's report refers to a

January 2000 treatment plan review which noted that E.L. remained compliant with taking prescribed medications because he believed that refusing to do so would cause him difficulties. E.L. himself testified that he would continue to take Risperidone and lithium because he is "[told] to do it." Therefore, the probate court could have reasonably found that E.L. has been compliant with prescribed medications due to the compulsory nature of the guardianship and not because he appreciates the need for them.

The record also would support a finding that E.L. is unable to exercise sound judgment in assessing the risk of interrupting his current medication regime. While Lazar noted that it is possible for someone to have an illness and refuse treatment in a sound manner for reasons the medical professional may disagree with, he testified that E.L. is unable to exercise sound judgment in deciding upon a particular course of medical treatment. Lazar explained that while E.L. can understand all the factual information concerning his illness and the efficacy of medication, he lacks the ability to rationally and reasonably weigh the competing risks involved with accepting or rejecting a particular treatment plan.

Although E.L.'s treatment team affirmed his concerns about the side effects of his medications, evidence would support a finding that E.L. has focused exclusively upon the side effects. E.L. testified that he initially denied suffering from bipolar disorder because he did not want to be labeled a "freak," but that over time he has grown to accept that he is afflicted with a mental illness and needs lithium. His testimony, as well as the remaining record, however, is devoid of evidence that reveals his consideration of and appreciation for the symptoms that would likely arise in the event he stopped or altered his medications and decompensated. E.L.'s limited understanding of his mental illness, as well as his failure to appreciate and consider the risks of interrupting a medication regime that has effectively treated it, supports the finding that his ability to exercise sound judgment about his medical treatment remains meaningfully impaired. As Lazar testified, "It's hard to make an informed decision about your medications if you don't have an appreciation for the fact that you have a particular illness and that there are consequences to not treat as well as to treating and make a decision based on the most favorable outcome."

Finally, there is evidence of E.L.'s prior dangerousness when not adequately medicated. The record refers to his prior convictions for willful cruelty towards children, and he currently is incarcerated for sexually assaulting his wife. Further, there is evidence in the record that E.L.'s wife reported that he beat her over a five-year period. Once transferred to

SPU after his conviction, he was at times confined in the most restrictive unit because he verbally abused the staff, failed to follow rules, displayed inappropriate behavior and lacked self control. He also refused to take medications and displayed obsessive behavior. Once guardianship was imposed, however, he began to take prescribed medication, and his behavior substantially improved.

While incarcerated and medicated only with lithium, E.L. was in two prison fights. The second fight, in 2002, was so significant that his facial injuries required reconstructive surgery. Although E.L. denies that he provoked the altercation in any manner, evidence shows that this fight occurred about one year prior to the diagnosis of the psychotic component to his bipolar disorder and prescription for Risperidone. According to his treatment team, before E.L. began taking Risperidone, he would report interactions with other inmates where he used provocative language that the treatment team concluded could trigger arguments. Moreover, the probate court could have reasonably questioned the credibility of E.L.'s account of the prison fight considering that he denied to Lazar that he sexually assaulted his wife and blamed her for fabricating the charge.

Lazar testified that E.L.'s crimes involving children and his wife likely were connected to his mental illness. E.L.'s treatment team and Lazar himself expressed concern about his history of violence and testified that should he refuse to take his medications, he will likely decompensate and become a danger to himself and others. Lazar and members of the treatment team also expressed concern that should E.L. decompensate, his relationship with others and the quality of his life would likely suffer, that he might not be able to live in the prison's general population, that his opportunity for parole in 2008 could be diminished and that restoring his current good functioning could be a lengthy process, if not impossible.

E.L. argues that the acts which gave rise to guardianship in 1995 are not relevant, and that the guardian failed to present sufficient recent evidence to support continuation of the guardianship. *See* RSA 464-A:40. E.L. appears to contend that by statute, to prove that he remains incapacitated, the guardian could only rely upon evidence of acts that occurred within six months of the date of the filing of the termination motion. *See* RSA 464-A:2, XI. The State argues, however, that application of this specific time requirement is relevant only to initial petitions for guardianship.

In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *Snedeker v. Snedeker*, 145 N.H. 19, 20 (2000). We first examine the language found in the statute, and where possible, we ascribe the plain and ordinary meanings to words used. *Id.* at 20-21. However, we will not interpret statutory language in a literal manner when such a reading

would lead to an absurd result. *See State v. Warren*, 147 N.H. 567, 568 (2002).

As noted earlier, "incapacity" is defined

> to mean or refer to any person who has suffered, is suffering or is likely to suffer substantial harm due to an *inability* to provide for his personal needs for food, clothing, shelter, health care or safety or an inability to manage his or her property or financial affairs.

RSA 464-A:2, XI (emphasis added). The statute requires that such "[i]nability ... be evidenced by acts or occurrences, or statements which strongly indicate imminent acts or occurrences." *Id.* Moreover,

> [a]ll evidence of inability must have occurred within 6 months prior to the filing of the petition and at least one incidence of such behavior must have occurred within 20 days of the filing of the petition for guardianship.

*Id.* This specific time requirement, however, does not apply to proceedings for termination of guardianship.

When a ward seeks to terminate guardianship, the probate court conducts "a hearing *similar to* that provided for in RSA 464-A:8 and RSA 464-A:9." RSA 464-A:40, II(c) (emphasis added). By utilizing the phrase "similar to," the legislature understood that not all aspects of a guardianship termination proceeding would be identical to an initial proceeding seeking the appointment of a guardian. At the termination proceeding, "the guardian [must] prove that the grounds for appointment of a guardian provided in RSA 464-A:9 *continue to exist,*" *id.* (emphasis added), including, necessarily, that the ward remains incapacitated, *see* RSA 464-A:9, III(a). For a ward who has been deemed incapacitated and is under guardianship care, the outward manifestations of incapacity may have decreased, if not completely dissipated, as a result of the proper attention and care provided through the guardian. While having secured some ability to provide for his personal needs, the ward may not have necessarily regained capacity to the degree that obviates the need for a guardianship. In such a case, requiring the guardian to prove the continuation of the ward's incapacity based exclusively upon evidence of acts, occurrences or statements that happened within six months of the termination motion would lead to an absurd result. Accordingly, we conclude that while a guardian's burden to prove the continuation of incapacity under RSA 464-A:40, II(c) requires proof of the ward's *present* inability to provide for his personal care as defined under RSA 464-A:2,

XI, the guardian is not restricted to presenting evidence of acts, occurrences or statements that occurred within the specific time period provided under RSA 464-A:2, XI.

In sum, we conclude that evidence in the record supports the probate court's finding beyond a reasonable doubt that E.L. is presently unable to participate in or perform minimal activities of daily living with respect to his health care and that he is likely to suffer substantial harm if the guardianship is terminated. *See* RSA 464-A:2, VII, XI. Accordingly, we uphold the probate court's finding that E.L. continues to have an incapacity for making his own health care decisions.

## IV

■ We next address E.L.'s argument that the probate court erred in finding that the guardian sustained its burden of proving beyond a reasonable doubt that no less restrictive alternative to guardianship exists. In addition to establishing E.L.'s continuing incapacity in order for the guardianship to continue, the record must support beyond a reasonable doubt that, among other things, no available alternative resources exist that are suitable to E.L.'s needs, RSA 464-A:9, III(c), and guardianship is the least restrictive form of intervention, RSA 464-A:9, III(d). Specifically, with respect to available resources, chapter 464-A requires that

> no available alternative resources [exist] which are suitable with respect to the incapacitated person's welfare, safety, and rehabilitation or the prudent management of his or her property and financial affairs.

RSA 464-A:9, III(c). "Available alternative resource" is defined to mean "alternatives to guardianship including, but not limited to, . . . powers of attorney . . . ." RSA 464-A:2, II (2004).

Concerning the least restrictive form of intervention, chapter 464-A provides that guardianship must be:

> appropriate as the least restrictive form of intervention consistent with the preservation of civil rights and liberties of the proposed ward.

RSA 464-A:9, III(d). "Least restrictive form of intervention" is defined to mean

> that the guardianship imposed on the ward represents only those limitations necessary to provide him or her with needed care and rehabilitative services, and that the ward shall enjoy the greatest

amount of personal freedom and civil liberties consistent with his or her mental and physical limitations.

RSA 464-A:2, XIV (2004).

Evidence was presented on two alternatives to guardianship at the evidentiary hearing: medical power of attorney and springing guardianship. Under these alternatives, a power of attorney would be invoked or a guardianship would "spring" into effect should certain prescribed events occur or symptoms arise. The probate court found:

> A power of attorney would not be sufficient because [E.L.] could cancel it. A springing guardianship would not meet [E.L.'s] needs because it would require [E.L.] to decompensate before it could be implemented. This would make further treatment more difficult and could result in an injury to [E.L.] or some other person during the time he decompensated.

We conclude that there is sufficient evidence to support the probate court's rejection of the alternatives to continued guardianship.

As discussed earlier, the evidence supports a finding that E.L. intends to change or discontinue his current medication regime. While E.L.'s incarceration would permit prison officials and medical personnel to closely monitor E.L.'s behavior, Lazar testified that if guardianship were terminated and E.L. went off his medications, his deterioration could be slow and not immediately visible to others, including his treatment team. Lazar also explained that "[t]here would be a lag time" between the moment E.L.'s decompensation is detected, a decision is made to trigger guardianship and guardianship is actually reinstated. The medical professionals expressed concern that if E.L. decompensated, he might not be able to be stabilized again because in some cases medicine that was once effective may be ineffective when taken again after an interruption.

 Fontaine testified that the structure of guardianship itself is significant to E.L.'s clinical treatment because he consistently maintains his medication due to the fact that another person controls his decision to take it. She explained that a springing guardianship may be appropriate for an individual who understands his mental illness as well as the need for continuing his medication, and who would remain compliant with medication with or without a guardian. Given E.L.'s limited insight into his illness and his impaired judgment concerning his current medication regime, evidence supports the probate court's finding that E.L. is not an appropriate candidate for a springing guardianship or a health care power of attorney. In sum, taking the evidence as a whole, we conclude that it was not unreasonable for the probate court to find beyond a reasonable doubt

that no less restrictive alternative other than guardianship exists. *See* RSA 464-A:9, III(c), (d). Accordingly, we hold that the evidence in the record is sufficient as a matter of law to support the probate court's denial of E.L.'s motion to terminate guardianship.

*Affirmed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.