Merrimack County Probate Court
No. 2007-387

IN RE GUARDIANSHIP OF G.S.

Argued: May 22, 2008
Opinion Issued: July 11, 2008

*Kelly A. Ayotte,* attorney general (*John C. Vinson,* attorney, on the memorandum of law, and *Suzanne M. Gorman,* senior assistant attorney general, orally), for the New Hampshire Department of Corrections.

*Mosca Law Office,* of Manchester (*Edward C. Mosca* on the brief and orally), for the appellant.

HICKS, J. The appellant, G.S., appeals from the order of the Merrimack County Probate Court (*Hampe,* J.) appointing a guardian over his person. We affirm.

The record supports the following. G.S. was serving a sentence at the Northern Correctional Facility (NCF) when he began to display delusional behavior. He was transferred to the Secure Psychiatric Unit (SPU) on or around December 21, 2005, because of his increasingly "paranoid, irritable [and] uncooperative" behavior and his refusal to comply with "treatment and attempts to work through prescriptions or treatment for discharge."

At the SPU, his delusional behavior intensified. G.S. refused medical testing, including testing for contagious diseases, out of fear that the tests might be poisoned or tampered with in some way by the prison staff. When prison meals were delivered to his cell, he expressed similar fears of tampering and often stored food in his cell until it spoiled and was discovered by prison staff. Additionally, G.S. expressed a fear that certain correctional officers intended to harm him. He refused to leave his cell when those staff members were on duty, resisted their efforts to maintain control over him and threatened to assault them.

G.S. was diagnosed with delusional disorder. He does not agree with his diagnosis, however, and refuses to participate in mental health treatment because he is adamant that he does not have a "mental condition that requires treatment." Because the SPU staff feared that G.S.'s continued refusal to acknowledge his mental illness and cooperate with the treatment team's recommended treatment plan was likely to result in harm to his health and safety, the New Hampshire Department of Corrections (DOC) filed a petition for guardian of incapacitated person on May 12, 2006.

At the hearing on the petition, the probate court heard testimony from G.S.'s treatment team. The director of the SPU, James Knoll, M.D.; G.S.'s treating psychiatrist at the SPU, Marcosa Santiago, M.D.; and a court-appointed psychologist, Eric Mart, Ph.D., testified that G.S. suffers from delusional disorder and does not believe that he has a mental illness.

Furthermore, these mental health professionals agreed that G.S.'s delusional disorder impairs his ability to make informed decisions about his mental health care. Additionally, the court heard testimony about G.S.'s mental health and behavior at the SPU from Louise Coulombe, R.N., a nurse at the SPU; Nancy Denu, Senior Psychiatric Social Worker at the SPU; Heidi Guinen, Senior Psychiatric Social Worker at the NCF; and G.S.

On May 4, 2007, the probate court found, pursuant to RSA 464-A:9, III (2004) that G.S. was incapacitated and appointed the office of public guardian as guardian over his person. In the guardianship order, the court rendered the four findings required by RSA 464-A:9, III (a)-(d); namely:

(a) The person for whom a guardian is to be appointed is incapacitated; and

(b) The guardianship is necessary as a means of providing continuing care, supervision, and rehabilitation of the individual, or the management of the property and financial affairs of the incapacitated person; and

(c) There are no available alternative resources which are suitable with respect to the incapacitated person's welfare, safety, and rehabilitation or the prudent management of his or her property and financial affairs; and

(d) The guardianship is appropriate as the least restrictive form of intervention consistent with the preservation of the civil rights and liberties of the proposed ward.

Additionally, the court determined that:

[N]otwithstanding [G.S.'s] obvious intelligence, he is suffering from a mental illness, Delusional Disorder, which prevents him from making informed decisions regarding his health care decisions and makes him unable to provide for his health care.

He has suffered and will continue to suffer substantial harm because his incapacity has resulted and will continue to result in his incarceration in the most restricted unit of the secure psychiatric unit.

On appeal, G.S. contends that the probate court's finding of incapacity is erroneous because the court equated "substantial harm" in RSA 464-A:2, XI (2004) with his continued assignment "in the most restricted unit of the secure psychiatric unit," as opposed to assignment to a less restrictive level. Additionally, G.S. argues that the probate court erred in finding that the

evidence demonstrates beyond a reasonable doubt that he is incapacitated and that no less restrictive alternative to guardianship exists.

We begin by considering the probate court's interpretation of the phrase "substantial harm" and its subsequent finding of incapacity. "Incapacity" is defined as a

> legal, not a medical, disability and [is] measured by functional limitations. It shall be construed to mean or refer to any person who has suffered, is suffering or is likely to suffer substantial harm due to an inability to provide for his personal needs for food, clothing, shelter, health care or safety.

RSA 464-A:2, XI.

G.S. maintains that the "substantial harm" contemplated by RSA 464-A:2, XI is limited to harm resulting from an inability to provide for one's "personal needs for food, clothing, shelter, health care or safety." RSA 464-A:2, XI. G.S. contends that since the court's finding of incapacity was not based upon one of the defined categories of harm outlined in the statute and was instead rooted in his continued incarceration in the most restrictive unit of the SPU, it was erroneous.

■ We disagree, however, with G.S.'s characterization of the probate court's decision. The court specifically found that G.S.'s mental illness "prevents him from making informed decisions regarding his health care decisions and makes him unable to provide for his health care." This express finding demonstrates that the probate court considered the factors delineated in RSA 464-A:2, XI and made a determination of incapacity based, in part, upon the harm that would likely result from G.S.'s inability to make informed health care decisions.

■ Additionally, "[n]othing in the plain language of the statute requires that the probate court provide written illumination of all facts used in making its ultimate findings with regard to paragraph III (a) through (d)." *In re Guardianship of Kapitula*, 153 N.H. 492, 495 (2006). In the instant case, the fact that the probate court explicitly mentioned G.S.'s confinement in the most restrictive unit of the SPU and the detrimental effect that his mental illness has on his health care decisions does not mean that it "implicitly rejected" all other evidence of incapacity, as G.S. contends. Accordingly, we are not persuaded that the probate court erroneously interpreted the guardianship statute.

We next consider whether the evidence supports the probate court's findings beyond a reasonable doubt that G.S. is incapacitated and that no less restrictive alternative to guardianship exists. "Because [G.S.] challenges the sufficiency of the evidence," "[o]ur task is to review the record to

determine whether it supports the probate court's finding that the guardian proved these statutory components beyond a reasonable doubt." *In re Guardianship of E.L.*, 154 N.H. 292, 296 (2006). During this assessment, "we examine whether the probate court's actual or implicit factual findings on the statutory components required for guardianship are reasonably supported by competent evidence." *Id.* However, we "defer to a trial court's judgment on such issues as resolving conflicts in testimony, measuring the credibility of witnesses, and determining the weight to be given to testimony." *In re Guardianship of Kapitula*, 153 N.H. at 497. "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (2007). Therefore, "we do not reweigh the evidence to determine whether we would have ruled differently." *In re Guardianship of E.L.*, 154 N.H. at 296.

We first turn to whether the evidence supports the probate court's finding beyond a reasonable doubt that G.S. is incapacitated. The record contains competent evidence to support the conclusion that G.S. is likely to suffer "substantial harm due to [his] inability to provide for his personal needs for . . . health care [and] safety." RSA 464-A:2, XI.

Knoll, Santiago and Mart all testified that G.S. suffers from a psychiatric illness known as delusional disorder. They agreed that he is unable to weigh the competing risks involved with accepting or rejecting treatment for this condition because "he's proceeding from a false premise," as he does not believe that he suffers from this mental disease. Knoll testified that when he initiates conversations with G.S. about his mental health treatment, G.S. "becomes extremely irate and the conversation . . . deteriorates."

Although G.S. refuses to acknowledge his diagnosis, he complained to his treatment team of stress and anxiety and was prescribed Vistaril for these symptoms. Mart explained, however, that G.S. stopped taking the medication because of a delusional belief that it was being tampered with by prison staff. Although G.S. was told that different shapes and sizes of the same medication might be delivered to him because the prison bought different lots of generic medications, his paranoia impeded his ability to believe this rational explanation and he now refuses to take this medication.

Santiago testified that in her professional opinion, G.S.'s delusional disorder would benefit from medication. She explained that antipsychotic medication, in low doses, would effectively treat G.S.'s paranoia. Despite the availability of treatments for this mental illness, Coulombe indicated that prior to the filing of the guardianship petition, G.S.'s condition had deteriorated because of his refusal to work with the SPU treatment team. Knoll and Santiago both testified that G.S. is likely to suffer substantial harm due to his inability to make informed health care decisions. Knoll explained that this harm is likely to occur in the absence of a medical

guardian because G.S. is undergoing "a slow, gradual progression of worsening paranoid symptoms and refusal of medical care."

In addition to the deterioration of his mental health, evidence in the record permits a reasonable person to conclude that G.S.'s physical health is likely to suffer substantial harm. G.S. refuses to take a tuberculosis test despite his elevated risk of contracting this disease by living in a prison setting and the prison requirement that he take the test in order to leave the SPU and move up in levels of privilege in the prison. Additionally, G.S. refuses to be tested for hepatitis A, B or C, or allow the treatment team to perform lab work for fear that the blood extracted might be used in some malevolent way. Santiago testified that G.S.'s continued refusal to take lab tests might negatively affect his medical health because blood tests uncover dangerous cholesterol or blood sugar levels.

Furthermore, G.S. suffers from chronic back pain and has been taking ibuprofen "consistently for quite some time." Coulombe testified that G.S. used the drug "every day, two, three times a day." Since ibuprofen can be toxic to one's liver and cause kidney damage, Santiago was concerned about these potential side effects. His doctor requested that G.S. submit to lab work before renewing the prescription. As G.S. refused to comply with the request for lab work, he is no longer entitled to receive this pain medication. Moreover, the effect that his prolonged use of this drug has had on his liver and kidneys is currently unknown.

The record also demonstrates that G.S.'s paranoid delusions endanger his safety. When asked about the effect that G.S.'s illness has had on his safety, Knoll testified that "it's abundantly clear that his paranoia increases [the] risk" to his safety. Santiago testified that G.S. "acts in . . . a defensive way because of his paranoid ideation." Santiago and Coulombe both explained that the defensive behavior that G.S. exhibits as a result of his delusions puts his personal safety in jeopardy because he misperceives the intentions of correctional officers and becomes "very resistive and . . . pull[s] away from the officers." When G.S. pulls away from the officers, "[h]e's usually handcuffed in the back." Pulling away in this manner affects the tension in the handcuffs and "cause[s] him pain."

Finally, G.S.'s refusal to submit to a tuberculosis test forces the staff to keep him confined in the most secure unit in the SPU. He is restricted to his cell for approximately 23 hours a day, isolated from the general population and is prohibited from moving up in levels of privilege within the prison. By continuing to reject treatment, G.S. is negatively affecting his eligibility for parole and may serve the maximum for his sentence. The probate court found that G.S. "has suffered and will continue to suffer substantial harm because his incapacity has resulted and will continue to result in his incarceration in the most restricted unit of the secure

psychiatric unit." We need not decide whether, in isolation, this level of restriction could support the imposition of a guardianship; in this case, it is relevant evidence of the substantial harm that G.S. is suffering and lends support to the probate court's ultimate holding.

■ The record contains evidence of the deterioration of G.S.'s mental health, the negative effect that his mental illness has on his health care decisions, and the risk to his safety that results from his paranoid delusions. We conclude that the record, considered in its entirety, supports the probate court's finding of incapacity beyond a reasonable doubt.

■ Lastly, we consider whether the DOC sustained its burden of proving beyond a reasonable doubt that no less restrictive alternative to guardianship exists. In addition to establishing G.S.'s incapacity, in order for a guardianship to be imposed, the record must support beyond a reasonable doubt that "no available alternative resources exist that are suitable to [G.S.'s] needs, and [that] guardianship is the least restrictive form of intervention." *In re Guardianship of E.L.*, 154 N.H. at 302 (citation omitted).

"Available alternative resource" is defined to mean "alternatives to guardianship including, but not limited to, services such as visiting nurses, homemakers, home health aides, adult day care and multipurpose senior citizen centers; powers of attorney, representative and protective payees; and board and care residential care facilities." RSA 464-A:2, II (2004). "Least restrictive form of intervention" is defined to mean "that the guardianship imposed on the ward represents only those limitations necessary to provide him or her with needed care and rehabilitative services, and that the ward shall enjoy the greatest amount of personal freedom and civil liberties consistent with his or her mental and physical limitations." RSA 464-A:2, XIV (2004). We conclude that there is sufficient evidence to support the probate court's rejection of the alternatives to guardianship.

■ When Santiago was asked whether there are any less restrictive alternatives to guardianship in her opinion, she responded that there is "[n]othing less restrictive than a guardianship." This testimony was uncontroverted. Moreover, in light of G.S.'s confinement in the SPU at the New Hampshire State Prison, many alternatives listed in RSA 464-A:2, II are not viable options. Furthermore, when an individual has limited insight into his mental illness and has impaired judgment regarding his need for medication, we have held that the individual "is not an appropriate candidate for a springing guardianship or a health care power of attorney." *In re Guardianship of E.L.*, 154 N.H. at 303.

In sum, taking the evidence as a whole, we conclude that it was not unreasonable for the probate court to find beyond a reasonable doubt that no less restrictive alternative to guardianship exists. Accordingly, we hold that the evidence in the record supports the probate court's guardianship order.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.