NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Public Employee Labor Relations Board
No. 2016-0558

APPEAL OF NASHUA SCHOOL DISTRICT
(New Hampshire Public Employee Labor Relations Board)

Argued: June 1, 2017
Opinion Issued: October 4, 2017

Jackson Lewis P.C., of Portsmouth (Thomas M. Closson on the brief and orally), for Nashua School District.

Sean R. Cronin, of Manchester, on the brief, and Joseph L. DeLorey, of Boston, Massachusetts, on the brief and orally, for AFSCME, Council 93, Local 365.

LYNN, J. The Nashua School District (District) appeals an order of the New Hampshire Public Employee Labor Relations Board (PELRB) finding that the District committed an unfair labor practice by refusing to bargain with the American Federation of State, County, and Municipal Employees (AFSCME), Council 93, Local 365, Nashua Custodial/Janitorial Staff (Union) concerning the District's plan to subcontract custodial work at the expiration of the term of the collective bargaining agreement (CBA) between the parties. We reverse and remand.

The pertinent facts are as follows. The most recent CBA between the District and the Union covered the period from July 1, 2013 through June 30, 2016. The CBA encompassed the employment of all full-time and part-time custodians and maintenance personnel employed by the District. Three provisions of the CBA are pertinent to the present dispute.

Article 5, entitled "Volunteering and Subcontracting," states, in relevant part:

> 5.2   A. The District agrees there will be no layoffs, demotions or involuntary transfers as a result of contracting out work. Regardless of subcontracting, in the event of any layoff within a classification, the District shall cease to utilize any subcontractor for work specific to that classification except for work identified on the master list or previously agreed upon contracted projects, until such time [as] the staffing levels return to the pre-layoff levels. The Director of Plant Operations shall maintain a master list, initialled by both parties, with mutually agreed-upon work that has been historically subcontracted out. Work on the master list shall not be assigned to bargaining unit employees to complete.
>
>   B. 1. The District shall present the work it is contemplating to subcontract in a reasonable period in advance and not delay the work so the volume of work is anything but for unforeseen circumstances. The Union shall respond in five (5) working days, or the District shall proceed with subcontracting the work.
>
> 2. The District shall identify the primary classification in accordance with the bargaining unit job description that it believes will be used in the work to be discussed. If the work will be completed on overtime, the District will post the overtime opportunity upon notice from the Union under Section B.1. above and the Union shall have the opportunity to survey the work force for interest and availability. If the agreed upon necessary workforce is not available by the mutually agreed upon date, then the District may contract out.
>
> 3. When bargaining unit employees are doing work which was initially contemplated to be subcontracted, custodial staffing of the building shall be subject to an agreement

by the parties. Any agreement on building coverage based on the previous sentence shall not be used outside of this process.

C. Should any work be contemplated to contract out, the District and the Union agree the following procedure shall occur prior to subcontracting.

1. Step One – The Union will designate one Union member. The Director of Plant Operations will advise this member of the work it is contemplating contracting out. A discussion as to whether or not bargaining unit members can complete the work shall occur. If an agreement cannot be reached and the District still desires to subcontract said work, the parties shall proceed to Step Two.

2. Step Two – The District shall bring the proposed work to the next scheduled joint labor-management committee meeting for discussion. If an agreement cannot be reached and the District still desires to subcontract said work, the parties shall proceed to Step Three.

3. Step Three – The parties shall mutually agree on an arbitrator to decide if the work is bargaining unit work or not. The basis for consideration shall be the job descriptions for all classifications, the scope of the bargaining unit work, as well as prior grievance decisions and/or grievance settlements. Overtime shall not be a factor in considering if the work is bargaining unit work or not. The District may subcontract out the work prior to arbitration; however, the subcontracting of the work cannot be used as consideration for the arbitrator's decision and the District understands that an arbitrator's decision that the work should have been done in-house will require the District to pay bargaining unit members for work already performed.

4. The Arbitrator's decision shall be final and binding on the parties. The arbitration shall be in accordance with AAA rules. The cost of the arbitration shall be borne equally by both parties.

Article 28 of the CBA, entitled "Management Rights," states:

> Except as otherwise . . . provided in this Agreement, the Union recognizes that the direction of the District operations; the determination of the methods and means by which such operations are to be conducted; the supervision, management and control of the District work force; the right to hire, promote, transfer, and lay off employees; the right, lawfully and for just cause, to demote, discipline, suspend or discharge employees; the right to determine the hours and schedules of work and the work tasks and standards of performance for employees and all other rights and responsibilities not specifically provided in this [A]greement, shall remain the function of Management, all in accordance with RSA Ch. 273-A. It shall be the right of the Union, however, to present and process grievances of its members whose wages, working conditions or other rights expressly and specifically provided in this Agreement are violated by Management.

Article 29 of the CBA, entitled "Duration of Agreement" provides, in relevant part:

> On June 30, 2016 and on each June 30th thereafter, this Agreement shall be deemed renewed and extended for the ensuing year, unless one hundred twenty (120) calendar days or more prior to such date, either party shall have delivered to the other, notice of its desire not to have the agreement in its then form renewed. Such notice shall be deemed delivered when mailed, postage prepaid, addressed to the last address of the addressee which is known to the sender of this notice. If such notice shall be sent and the parties shall negotiate for a new agreement or modification thereof, the terms hereof shall continue to apply until the new or modified agreement is executed.

In a September 2015 memorandum, the District provided written notice to the Union, in accordance with Article 29 of the CBA, that it did not wish to renew the CBA in its current form. The memorandum also stated that the District intended, following the expiration of the CBA, to contract with a private company to provide custodial services. The District cited financial reasons as the motivation for its decision to pursue privatization.

The next day, the Union responded to the District in a letter requesting that it immediately commence negotiations on a successor CBA for all employees covered by the then-current CBA. The District responded to the Union's request with another letter, stating that, due to its decision to privatize, it declined to commence negotiations with the Union regarding the employment of custodians. However, the District did offer to commence negotiations on the

4

terms and conditions of employment for all other positions included in the CBA. The District specifically clarified in the letter that its "agreement to open negotiations for a successor collective bargaining agreement for the [non-custodian] employees should in no way be construed as an offer to negotiate the terms and conditions for custodial personnel covered by the current collective bargaining agreement." The Union declined this offer, stating that it expected the district to negotiate the terms and conditions of a successor CBA for all the employees that the Union represents. As a result, the parties did not commence any negotiations.[1]

In December 2015, the Union filed an Unfair Labor Practice charge with the PELRB, alleging that the District was in violation of its statutory bargaining obligations, as well as the terms of the CBA. The parties subsequently agreed to submit the breach of the CBA claim to arbitration and to seek a ruling from the PELRB with respect to the unfair labor practice claim only. The parties also agreed that the latter claim would be submitted to the PELRB based upon stipulated facts, exhibits, and written briefs.

In August 2016, the PELRB released an order in which it ruled that the District had improperly refused to bargain with the Union over the custodial personnel positions, violating the bargaining obligations imposed by RSA 273-A:5, I(a) and (e) (2010). The PELRB also ruled that the District's offer to conduct negotiations with regards to maintenance and security personnel had "activate[d] the Article 29 duration clause." Moreover, the PELRB found that nothing in RSA chapter 273-A (2010 & Supp. 2016) "empowere[d] the District, by virtue of its Article 29 notice or otherwise, to simultaneously and unilaterally terminate its bargaining obligations, in whole or in part, at any point in time," and ruled that only final and binding arbitration could serve as a proper forum to decide the matter of the District's right to subcontract the work performed by its custodial employees. Independent of those rulings, the PELRB noted that nothing in RSA chapter 273-A allowed the District to "unilaterally modify the composition of the PELRB approved bargaining unit," and ordered the District to "immediately commence bargaining in good faith with the Union as to all bargaining unit positions." This appeal followed.

II

"RSA chapter 541 governs our review of PELRB decisions." Appeal of Prof'l Fire Fighters of Hudson, 167 N.H. 46, 51 (2014); see RSA 273-A:14 (2010); RSA 541:2 (2007). "Pursuant to RSA 541:13 (2007), we will not set aside the PELRB's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that it is unjust or unreasonable." Fire Fighters of Hudson, 167 N.H. at 51. "The PELRB's findings of fact are

---

[1] The PELRB's order stated that the parties had "undertaken negotiations, at least as to maintenance and security personnel." However, both parties agree that this statement in the PELRB order is erroneous and that no negotiations between the District and the Union took place.

presumed prima facie lawful and reasonable." Id.; see also RSA 541:13. "In reviewing the PELRB's findings, our task is not to determine whether we would have found differently or to reweigh the evidence, but, rather, to determine whether the findings are supported by competent evidence in the record." Fire Fighters of Hudson, 167 N.H. at 51. "We review the PELRB's rulings on issues of law de novo." Id.

Reduced to its essence, the issue before the court in this case is whether our prior decisions in Appeal of City of Nashua Board of Education, 141 N.H. 768 (1997), and Appeal of Hillsboro-Deering School District, 144 N.H. 27 (1999), preclude a public employer from ever unilaterally determining to subcontract work that is performed by Union members under a CBA. The Union, in essence, asserts that they do; the District argues that they do not. We agree with the District.

In Appeal of City of Nashua, following the expiration of a collective bargaining agreement between the city and the union, the parties commenced negotiation of a successor agreement. Appeal of City of Nashua, 141 N.H. at 770. While the negotiations were in progress, the city informed the union that it planned a reorganization in which 28 full-time custodians would be laid off and replaced with over 30 part-time custodians, who would be paid lower wages and would not receive fringe benefits. Id. The union responded by filing an unfair labor practice charge. Id. It asserted that, although a "pure" layoff would neither have violated the terms of the CBA nor constituted an unfair labor practice, the combination of the layoff with the hiring of part-time personnel to perform the same work as had been performed by bargaining unit members constituted a unilateral change in the conditions of employment that violated the CBA as well as several provisions of RSA 273-A:5, I. Id.

The PELRB found that the city had committed an unfair labor practice by making a unilateral change in the terms and conditions of employment during the status quo period,[2] and we upheld that determination. Id. at 770-71, 777. In reaching our decision, we noted that, during the status quo period in which the union and the public employer are negotiating a new contract, the employer is prohibited from making unilateral changes only with respect to mandatory subjects of bargaining. Id. at 773. No similar restriction applies with respect to permissive subjects of bargaining. Id. Relying upon the three-step test we articulated in Appeal of State of New Hampshire, 138 N.H. 716, 722-23 (1994), we held that the city's proposal to replace full-time employees with part-time employees receiving lower wages and benefits satisfied all three prongs of the test, and was therefore a mandatory subject of bargaining rather than a matter of "managerial policy within the exclusive prerogative of the public employer" within the meaning of RSA 273-A:1, XI (1987). Id. at 773-76.

---

[2] The "status quo period" is the period after the expiration of a CBA during which the parties negotiate for a successor agreement while generally operating under the terms and conditions of the expired CBA. See Appeal of Alton School Dist., 140 N.H. 303, 307 (1995).

In Appeal of Hillsboro-Deering, during the term of an existing collective bargaining agreement, the school district terminated the employment of all members of the bargaining unit and subcontracted their duties to workers employed by an independent contractor. Appeal of Hillsboro-Deering, 144 N.H. at 28. The PELRB sustained the union's unfair labor practice complaint, rejecting the district's claim that its decision to subcontract was a matter within its sole discretion under the CBA and RSA 273-A:1, XI. Id. at 28-29. On appeal, we delineated the issue before us as "whether the PELRB correctly ruled that the school district committed an unfair labor practice by laying off bargaining unit employees, so it could subcontract with private companies to perform identical services, during the term of the CBA." Id. at 29 (emphasis added). Again applying the three-part test of Appeal of State of N.H., we found that replacing bargaining unit members with subcontracted workers to perform the same duties satisfied all prongs of the test, was therefore a mandatory subject of bargaining, and could not be unilaterally implemented by the district. Id. at 31-33. The dissent in Appeal of Hillsboro-Deering found the case distinguishable from Appeal of City of Nashua, in that the district "was not laying off to rehire new workers at a cost saving, but to put a private contractor in charge with full responsibility for the function." Id. at 33-34 (Horton, J., joined by Thayer, J., dissenting). In the dissent's view, "such a 'reorganization' is a classic example of managerial policy and outweighs the claim of impact on the terms and conditions of employment." Id. at 34.

Neither party has asked us revisit our decisions in Appeal of City of Nashua or Appeal of Hillsboro-Deering, nor provided us with a stare decisis analysis demonstrating a proper basis to do so. Although we are thus bound to adhere to those decisions, we are under no obligation to expand their reach. Here we find strong reasons not to do so because this case is distinguishable from the foregoing cases in important respects.

First, unlike in Appeal of City of Nashua, the District's proposed reorganization in this case does not involve replacing employees of one kind (full-time) with employees of another kind (part-time). Under the plan, the workers who perform custodial work for the District will not be employees of the District, but rather will be employees of an independent third party contractor. Thus, the proposal envisions a qualitatively different relationship between the District and its custodial staff — one lacking contractual privity — from the relationship that existed under the expired CBA. The replacement of employees with workers provided through an independent contractor involves more than simply substituting one group of individuals for another group who perform the same work. The use of an independent contractor relieves the District of the responsibility for providing the kind of close supervision that typically characterizes the employer-employee relationship, allowing the District to delegate to the independent contractor responsibility for such things as the instruction, training, and orientation of the workers, the provision of the tools and instrumentalities needed to accomplish their tasks, and the details of

7

the manner in which the work is accomplished.  See Petition of City Cab of Manchester, 139 N.H. 220, 221-22 (1994) (reciting factors that bear upon question of whether person is employee or independent contractor).  By relieving management of these responsibilities, the employer not only enables management employees to devote more time and effort to other duties, but also may reduce the need for the level of support staff (e.g., human resource personnel) required by the organization.  In short, the District's decision to replace its custodial employees with subcontracted workers employed by an independent contractor is far different from the replacement of full-time employees with part-time employees at issue in Appeal of City of Nashua.

Second, in this case, unlike in Appeal of City of Nashua, the District did not propose its reorganization plan during the time it was negotiating for a new contract with members of the same bargaining unit.  Instead, it notified the Union of its intention to lay off the custodians at the expiration of the CBA before negotiations for a successor CBA commenced.  This is significant because a proposed reorganization by management made during the course of bargaining for a successor agreement is more likely to be perceived as an unfair effort to skew the level playing field of the bargaining process, perhaps with a view to obtaining concessions on other, unrelated issues.  Where, as here, the District provides notice of the reorganization in advance of negotiation, and the record contains no indication that the reorganization was in any way tied to other issues that would be the subject of the future negotiations, there is far less danger that the reorganization will disrupt the bargaining process.

Third, this case is distinguishable from Appeal of Hillsboro-Deering, in that that case involved an effort by the school district to lay off employees and subcontract bargaining unit work during the term of the existing CBA.  In that decision, we had no occasion to consider whether, after the expiration of the CBA, it is within the management prerogative of a public employer to reorganize its operations by contracting with a third party for the performance of the work of bargaining unit members.

Here, we agree with the District that, if we were to apply the status quo doctrine in the manner that the Union advocates, the result could be that the District would be perpetually precluded from reorganizing its operations so as to subcontract custodial work to an independent contractor.  The CBA that expired on June 30, 2016 is ambiguous with respect to the issue of layoffs and subcontracting.  The first sentence of Article 5.2.A of the CBA seems flatly to prohibit the District from laying off bargaining unit members as a result of contracting out work.  However, Article 5.2 goes on to include language that indicates that some contracting-out can occur; it provides that proposals to contract out work are subject to a four-step bargaining procedure which culminates in binding arbitration.  In considering application of the status quo doctrine in light of these terms, it is important to note a crucial difference

between private sector collective bargaining and public sector collective bargaining under the Public Employees Labor Relations Act (PELRA). In the private sector, after good faith bargaining to impasse, the employer is entitled to implement unilaterally the terms consistent with its proposals made during bargaining. See Litton Financial Printing v. N.L.R.B., 501 U.S. 190, 198 (1991). Under the PELRA, however, the employer is not relieved of its obligation to continue bargaining even after impasse has been reached and all of the dispute resolution procedures specified in RSA 273-A:12 (2010 & Supp. 2016) have been exhausted. See RSA 273-A:12, IV ("If the impasse is not resolved following the action of the legislative body, negotiations shall be reopened.").

If the status quo doctrine were applied to require that the terms of Article 5 of the now-expired CBA remain in effect until agreement is reached on a new CBA, the District could be effectively precluded from ever implementing its reorganization plan by the Union refusing to agree to a new CBA that allowed for layoffs. And, at best, during the continuation of the status quo period, the fate of the District's plan would be removed from its control and placed in the hands of an arbitrator. Cf. Appeal of Milton School Dist., 137 N.H. 240, 245-46 (1993) (noting concern that overly expansive application of status quo doctrine may improperly shift the balance of collective bargaining in favor of the union).

The District's position that this case is distinguishable from Appeal of City of Nashua and Appeal of Hillsboro-Deering is supported by the PELRB's decision in Lisbon Teachers Association, NEA-New Hampshire v. Lisbon Regional School District, PELRB Decision No. 1998-067 (Aug. 12, 1998). In that case, which was decided by the PELRB after its decision, which we affirmed, in Appeal of Hillsboro-Deering,[3] the PELRB rejected an unfair labor practice charge filed by the union based upon the school district's announcement that at the end of the then-current CBA it intended to eliminate the school nurse position and to subcontract for nursing services, and that it, therefore, would not negotiate salary or benefits for that position. Lisbon Teachers Ass'n, PELRB Decision No. 1998-067, at 5. After reviewing a number of its prior decisions, including its Hillsboro-Deering decision, as well as our decision in Appeal of City of Nashua, the PELRB reasoned:

> [I]t is apparent that there is an appropriate time when management may make changes in its organizational structure. If this were not the case and management was required to maintain a given organizational structure or category of employees

---

[3] Although our decision in Appeal of Hillsboro-Deering came after the PELRB's decision in the Lisbon Teachers Ass'n case, our opinion did not in any way undermine or question the reasoning of the PELRB decision in the Hillsboro-Deering case. See generally Appeal of Hillsboro-Deering, 144 N.H. at 27. Consequently, the basis upon which the PELRB distinguished the Lisbon Teachers Ass'n case from its own Hillsboro-Deering decision also is not undermined by our decision in Appeal of Hillsboro-Deering.

9

indefinitely, it would lose control of its expenditures and its ability to 'continue control of governmental functions.' RSA 273-A:1, XI.

It makes sense that the break point for changes in organizational structure should come at the conclusion of a given CBA. This maintains the integrity of the CBA during its term.

Id. After also observing that in Appeal of City of Nashua we were careful to make clear that "[t]erms and conditions of employment imposed as the result of the status quo doctrine do not become final forever," the PELRB "conclude[d] that the [school district] acted reasonably, prudently and in concert with RSA ch. 273-A when it gave notice of its intent to eliminate the school nurse position and not negotiate salary or benefits for it for School Year 1999-2000, after the conclusion of the current CBA." Id. (quotation and italics omitted) (emphasis in original).

Although in its subsequent decision in Farmington Education Support Professionals United, NEA-NH v. Farmington School District, PELRB Decision No. 2014-080 (Mar. 28, 2014), and in the instant case, the PELRB did not adhere to the reasoning of Lisbon Teachers Ass'n, it gave no explanation in either case for its failure to do so.[4] We think the PELRB's treatment of the subcontracting issue in Lisbon Teachers Ass'n was correct, and we now adopt its reasoning. RSA 273-A:1, XI (Supp. 2016) specifically provides that "'managerial policy' within the exclusive prerogative of the public employer . . . include[s] . . . the public employer's organizational structure, and the selection, direction and number of its personnel, so as to continue public control of governmental functions." The implications of applying the status quo doctrine in a manner that would effectively give the Union or an arbitrator a perpetual veto over the District's ability to reorganize its structure so as to replace bargaining unit members with subcontracted workers was not a matter we had occasion to consider in Appeal of City of Nashua or Appeal of Hillsboro-Deering. Squarely facing this issue now, we conclude that applying the status quo doctrine in this manner does not satisfy the third step of the Appeal of State of N.H. test because it would unduly interfere with public control of governmental functions. See Appeal of State of N.H., 138 N.H. at 722-23. Accordingly, we hold that the District did not commit an unfair labor practice by refusing to bargain with the Union concerning its plan to lay off its custodial employees and replace them with subcontracted workers after the expiration of the 2013-16 CBA.

III

The Union also argues, however, that the PELRB correctly determined that, by unilaterally making the decision to lay off custodians and replace them

---

[4] In fact, the PELRB's decisions in these later cases neither cited nor discussed its Lisbon Teachers Ass'n decision at all.

10

with subcontracted workers, the District, in effect, "modified" the bargaining unit so as to relieve itself of the obligation to bargain with the custodians, and that this constituted an unfair labor practice in violation of RSA 273-A:5, I(a) and (e). There are two answers to this argument. First, we disagree that the District's layoff and subcontract plan in any way modified the bargaining unit. The Union and the PELRB do not cite, nor are we aware of, any authority supporting the proposition that decertification or modification of a bargaining unit is a prerequisite to the District's ability to exercise its management prerogatives pursuant to RSA 273-A:1, XI.

Second, the District would have had no proper basis to seek decertification or modification of the bargaining unit. The reason is that, although we have held in section II that the District's decision to implement its layoff and subcontract plan after the expiration of the CBA falls within its managerial prerogatives, it does not follow from the fact that the District is not required to bargain over that decision that the District is completely relieved of its obligation to bargain with the Union concerning the custodians. Once again, we believe that the PELRB correctly addressed this very issue in its Lisbon Teachers Ass'n decision. In that case, the PELRB determined that, notwithstanding its ruling that the school district had acted properly in unilaterally determining to lay off the school nurse and subcontract for nursing services, this did not relieve the district of its obligation to bargain with the union regarding the impact of its decision on the laid-off employee. See Lisbon Teachers Ass'n, PELRB Decision No. 1998-067, at 6.

The same is true here. The District continues to be obligated to engage with the Union in impact bargaining regarding, for example, such matters as severance benefits for the custodians who will lose their jobs as a result of the District's decision to subcontract. Thus, the bargaining unit remains intact for this purpose. The distinction recognized in Lisbon Teachers Ass'n between the District's managerial prerogative to subcontract custodial work, on the one hand, and its obligation to bargain with the Union regarding the impact of its decision on the employees who will be terminated, on the other hand, is entirely consistent with our recognition of a similar distinction in Appeal of Berlin Education Ass'n, 125 N.H. 779 (1984). See Appeal of Berlin Educ. Ass'n, 125 N.H. at 784 (recognizing distinction between school board's unilateral authority to decide whether to offer extracurricular programs and its obligation to bargain with union regarding the wages to be paid its members who provide services for such programs, if they are offered).

Reversed and remanded.

DALIANIS, C.J., and HICKS and BASSETT, JJ., concurred.

11