NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Public Employee Labor Relations Board
No. 2017-0472


APPEAL OF NEW ENGLAND POLICE BENEVOLENT ASSOCIATION, INC.;
APPEAL OF STATE EMPLOYEES' ASSOCIATION OF NEW HAMPSHIRE, INC.,
SEIU, LOCAL 1984
(New Hampshire Public Employee Labor Relations Board)

Argued:  May 9, 2018
Opinion Issued:  November 6, 2018

Nolan | Perroni, P.C., of North Chelmsford, Massachusetts (Peter J. Perroni on the brief and orally), for petitioner New England Police Benevolent Association, Inc.


Glenn R. Milner, of Concord, by brief, and Nolan | Perroni, P.C., of North Chelmsford, Massachusetts (Peter J. Perroni orally), for petitioner State Employees' Association of New Hampshire, Inc., SEIU, Local 1984.


Gordon MacDonald, attorney general (Jill A. Perlow, assistant attorney general, on the brief and orally), for the respondent.

HANTZ MARCONI, J.  The petitioners, the New England Police Benevolent Association, Inc. (NEPBA) and the State Employees' Association of New Hampshire, Inc., SEIU, Local 1984 (SEA), appeal a decision of the New

Hampshire Public Employee Labor Relations Board (PELRB) dismissing their unfair labor practice complaints filed against the respondent, the State of New Hampshire.  We affirm.

The parties stipulated to, or the record supports, the following facts.  The SEA, the NEPBA, the Teamsters Local 633 (Teamsters), the New Hampshire Troopers Association (NHTA), and the New Hampshire State Police Command Staff of the New Hampshire Troopers Association are individual unions that, together, represent approximately 50 separate state employee bargaining units.  In December 2016, those five unions began negotiating with the State on successor contracts under RSA 273-A:9, I (2010), which requires unions representing state employees to negotiate with the State as a "bargaining committee" on "[a]ll cost items and terms and conditions of employment affecting state employees."  The first session was an organizational meeting, where the parties identified spokespersons, discussed bargaining schedules, reviewed, revised, and signed "ground rules," and discussed and agreed upon the order in which each of the five unions would make "proposal presentations" to the State.

After several bargaining sessions, the State rejected all wage proposals, explaining that "the Governor was not offering any wage increases . . . given anticipated increases in prescription drug costs in the healthcare market."  As a result, on March 7, 2017, the Teamsters and the NHTA declared an impasse.  See RSA 273-A:1, VI (2010) (defining "impasse" as the parties' failure, "having exhausted all their arguments, to achieve agreement in the course of good faith bargaining, resulting in a deadlock in negotiations").

Although no other unions declared an impasse, the State took the position that all five unions must proceed to impasse mediation.  See generally RSA 273-A:12 (Supp. 2017) (setting forth the procedures the parties must use when they have reached an impasse in negotiations, including mediation and fact-finding by a neutral third party).  The SEA challenged the State on this position, and subsequently, the petitioners each filed complaints with the PELRB.  During the pendency of these complaints, the State advised all five unions that it would select a mediator and continued to assert that all of the unions must participate in impasse mediation "because the issues to be resolved affected all bargaining units."

The PELRB consolidated the petitioners' complaints and found in a 2-1 vote that RSA 273-A:9, I, "requires all five unions to utilize the Union Committee format at the bargaining table and during impasse resolution proceedings until such time as the common terms and condition[s] of employment are settled."  Based upon that determination, the PELRB found: (1) the State was "entitled to insist that the five unions continue to adhere to the Union Committee format in the event one or more unions declares a bargaining impasse" in negotiating common costs, terms, and conditions; and

2

(2) the unions have the obligation to "coordinate with each other" to determine whether the bargaining committee will engage with the State at the bargaining table or in impasse resolution proceedings. The PELRB, therefore, dismissed the complaints and ordered the petitioners to coordinate with the other unions "to determine the forum in which negotiations will go forward." The petitioners unsuccessfully moved for rehearing, and this appeal followed.

"RSA chapter 541 governs our review of PELRB decisions." Appeal of Nashua Sch. Dist., 170 N.H. 386, 391 (2017) (quotation omitted); see RSA 273-A:14 (2010). "Pursuant to RSA 541:13 (2007), we will not set aside the PELRB's order except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that it is unjust or unreasonable." Nashua Sch. Dist., 170 N.H. at 392 (quotation omitted). "The PELRB's findings of fact are presumed prima facie lawful and reasonable." Id. (quotation omitted); see also RSA 541:13. "In reviewing the PELRB's findings, our task is not to determine whether we would have found differently or to reweigh the evidence, but, rather, to determine whether the findings are supported by competent evidence in the record." Nashua Sch. Dist., 170 N.H. at 392 (quotation omitted). "We review the PELRB's rulings on issues of law de novo." Id. (quotation omitted).

On appeal, the petitioners argue that the PELRB erred in finding that RSA 273-A:9, I, requires the unions to remain in the bargaining committee format, and acted unlawfully or unreasonably when it dismissed the petitioners' complaints. They assert that the PELRB's interpretation of RSA 273-A:9, I: (1) contradicts the plain language of the statute; and (2) leads to an absurd result. Because the petitioners challenge the PELRB's ruling on an issue of law, the court reviews the PELRB's decision de novo. Id.

Resolution of this issue requires that we interpret the language of the pertinent statutes. See Appeal of Laconia Patrolman Assoc., 164 N.H. 552, 555 (2013). "Although the PELRB's findings of fact are presumptively lawful and reasonable and will not be disturbed if supported by the record, we are the final arbiters of legislative intent as expressed in the words of a statute considered as a whole and will set aside erroneous rulings of law." Appeal of SEA (N.H. Community College System), 170 N.H. 699, 703 (2018).

When examining the statutory language, "we ascribe the plain and ordinary meaning to the words used." Laconia Patrolman Assoc., 164 N.H. at 555. "We do not consider words and phrases in isolation, but rather within the context of the statute as a whole," id., and "construe all parts of a statute together to effectuate its overall purpose and to avoid an absurd or unjust result," Appeal of Exeter Police Assoc., 154 N.H. 61, 65 (2006). "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Laconia Patrolman Assoc., 164 N.H. at 555. "We do not look

3

beyond the language of a statute to determine legislative intent if the language is clear and unambiguous." Appeal of Town of Deerfield, 162 N.H. 601, 603 (2011).

RSA chapter 273-A, New Hampshire's Public Employee Labor Relations Act, recognizes the right of public employees to create unions, see RSA 273-A:10 (Supp. 2017), :11, and sets forth rules governing negotiations between public employees and employers. See, e.g., RSA 273-A:3, II(a) (2010) (explaining when and how the parties must commence negotiations), :12 (setting forth impasse resolution procedures). RSA 273-A:3, I, sets forth a general rule that requires all parties "to negotiate in good faith." "'Good faith' negotiation involves meeting at reasonable times and places in an effort to reach agreement on the terms of employment, and [cooperating] in mediation and fact-finding required by this chapter." RSA 273-A:3, I; see also RSA 273-A:5, I(g) (prohibiting any public employer from "refus[ing] to negotiate in good faith with the exclusive representative of a bargaining unit"). In this way, "good faith" negotiation encompasses all parts of the negotiating process.

RSA 273-A:9, I, sets forth an additional rule that applies only to negotiations between the State and the unions representing state employees. RSA 273-A:9, I, provides:

> All cost items and terms and conditions of employment affecting state employees in the classified system generally shall be negotiated by the state, represented by the governor as chief executive, with a single employee bargaining committee comprised of exclusive representatives of all interested bargaining units. Negotiations regarding terms and conditions of employment unique to individual bargaining units shall be negotiated individually with the representatives of those units by the governor.

RSA 273-A:9, I, sets forth a framework for negotiations to occur between the Governor, on behalf of the State, and a single committee comprised of the exclusive representatives of all interested bargaining units when negotiating common cost items and terms and conditions of employment. This framework arguably provides for efficient and fair negotiations between the State and the unions on cost items and terms and conditions of employment that affect all unions representing state employees.

RSA 273-A:12, which applies to all public bargaining units and public employers, sets forth detailed procedures designed to assist parties who are at an impasse in negotiations reach a resolution to their dispute. When the parties reach an impasse, RSA 273-A:12, I(b) requires the parties to engage in mediation with a neutral third party. The statute further provides that, if the parties so choose, or if mediation does not resolve the dispute, a neutral party chosen by the parties or appointed by the PELRB shall make and report

4

findings of fact and recommendations. RSA 273-A:12, I(b). If one or both parties reject the recommendations, the statute sets forth additional steps to resolve the dispute. See RSA 273-A:12, II (submission of the neutral party's findings of fact and recommendations to the union's full membership and employer's board for a vote), III (submission of the neutral party's findings of fact and recommendations to the legislative board), IV (reopening negotiations if the parties still have not reached an agreement).

The petitioners do not dispute their obligation under RSA 273-A:9, I, to negotiate as a bargaining committee at the bargaining table on common cost items, terms, and conditions. However, the SEA asserts that the plain language of RSA 273-A:12 requires an impasse between the individual union and the State in order to trigger the impasse resolution procedures. Because neither the SEA nor the State has declared an impasse, the SEA argues that the impasse resolution procedures have not been triggered and, therefore, the State must continue bargaining with the SEA.

Similarly, the NEPBA argues that the plain language of RSA 273-A:9, I, and RSA 273-A:12 limits the bargaining committee format to negotiations at the bargaining table. Pointing to the absence of the word "committee" in RSA 273-A:12 and the references to individual bargaining units, see RSA 273-A:12, I(a)(1)-(2), the NEPBA asserts that requiring all five unions to maintain the bargaining committee format through impasse resolution procedures "improperly reads a committee bargaining requirement into RSA 273-A:12 that does not exist." Though the petitioners set forth different arguments, their conclusion is the same: once one or more unions in the bargaining committee reach an impasse in negotiations with the State, the plain language of the statute no longer obligates the unions to negotiate as a single bargaining committee and instead requires the State to negotiate individually with the unions who have not declared an impasse.

Here, the impasse declared by the Teamsters and the NHTA occurred after the State rejected all of the proposals on an item held in common by all of the bargaining committee members — wages. The reason for the State's rejection of the wage proposals was the same for all — the anticipated increase of prescription drug costs. Thus, the Teamsters' and NHTA's impasse declarations resulted from the State's position on wages that applied to "all union wage proposals."

The statutory scheme is silent as to the proper course of action under these circumstances. Arguably, such silence creates an ambiguity. See In re Juvenile 2005-212, 154 N.H. 763, 766 (2007). Because the legislative history is silent on this issue, it also provides no guidance to resolve any ambiguity. See Laws 1997, 351:53 (adding the bargaining committee language to RSA 273-A:9). We look, therefore, to the structure of the statutory scheme as a whole to discern the legislature's objectives. When we examine the pertinent

5

statutes in the context of the entire statutory scheme, rather than in isolation, we conclude that the legislature intended unions negotiating on behalf of state employees to continue negotiating with the State as a bargaining committee under the circumstances in this case when the item causing impasse with one or more unions is common to all.  See Exeter Police Assoc., 154 N.H. at 65.

Such an interpretation is consistent with the plain language of RSA 273-A:3, I, which defines "good faith negotiation" to include the steps provided in RSA 273-A:12 to resolve an impasse.  See RSA 273-A:3, I (defining "good faith negotiation" as including "cooperat[ing] in mediation and fact-finding"), :12, I-IV (setting forth the steps to resolving an impasse).  It is also consistent with the plain language of RSA 273-A:9, I, which mandates that "cost items and terms and conditions of employment affecting state employees . . . be negotiated by the state . . . with a single employee bargaining committee."  See McCarthy v. Wheeler, 152 N.H. 643, 645 (2005) ("The use of the word 'shall' is generally regarded as a command.").  Furthermore, it is consistent with the apparent purpose of RSA 273-A:9, I, namely, to provide for efficiency and fairness in negotiations on common items and terms and conditions of employment between the State and the unions representing state employees.  Finally, it is consistent with the evident purpose of RSA 273-A:12, which is to enable the parties to resolve the impasse.

We disagree with the petitioners that our interpretation leads to an absurd result or is unjust and unreasonable.  When, as in this case, the State has rejected all proposals on an item common to all unions, which has caused at least one union to declare an impasse, it is reasonable to allow the State to engage in impasse negotiations with all of the unions participating as a single bargaining committee.

We further disagree with the NEPBA that our interpretation somehow deprives the petitioners of their ability to exercise independent negotiation strategies.  When, as in this case, the State seeks to negotiate with the unions as a single bargaining committee after it has rejected all proposals on a common item, we fail to see how requiring the parties to engage in impasse resolution proceedings, with the unions participating as a single bargaining committee, deprives the unions of their ability to "maintain an effective bargaining posture."  Both stages of negotiation — bargaining at the table and resolving an impasse — allow the unions to advocate for the interests of their respective members.  See RSA 273-A:12, I(a)(1)-(2) (allowing parties to make presentations to the other party), I(b) (mediation and fact-finding).  Whether the parties continue negotiating at the table or enter into impasse resolution procedures, the unions will be negotiating with the State as to an item that all five unions have in common.

Because our function "is not to make laws, but to interpret them, any public policy arguments relevant to the wisdom" of the statutory scheme "and

its consequences should be addressed to the General Court." <u>Logan v. Logan</u>, 120 N.H. 839, 843 (1980).  If the legislature disagrees with our interpretation, it is free to amend the statutory scheme as it sees fit.  <u>See</u> <u>Appeal of Town of Nottingham</u>, 153 N.H. 539, 566 (2006).

Because we interpret the statute under these circumstances to require the unions to negotiate with the State as a single bargaining committee, the PELRB did not act unlawfully or unreasonably in dismissing the petitioners' unfair labor practice complaints or in ordering the petitioners to "coordinate with each other to determine the forum in which negotiations will go forward and thereafter utilize the Union Committee format accordingly."

All arguments the petitioners raised in their notice of appeal, but did not brief, are deemed waived.  <u>In re Estate of King</u>, 149 N.H. 226, 230 (2003).

<u>Affirmed</u>.

LYNN, C.J., and HICKS, BASSETT, and DONOVAN, JJ., concurred.

7